## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-01527-COA

**ROBERT DECATUR A/K/A ROBERT JAMES DECATUR**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 08/09/2018 |
| TRIAL JUDGE: | HON. TOMIE T. GREEN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAUREN GABRIELLE CANTRELL |
| DISTRICT ATTORNEY: | JODY EDWARD OWENS II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/25/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE CARLTON, P.J., LAWRENCE AND SMITH, JJ.

### SMITH, J., FOR THE COURT:

¶1.     A Hinds County jury convicted Robert Decatur of the second-degree murder of Dammian Trunnell. The Hinds County Circuit Court sentenced Decatur to thirty years in the custody of the Mississippi Department of Corrections (MDOC), with ten years to serve, twenty years suspended, and five years of supervised probation. On appeal, Decatur argues the circuit court erred by (1) excluding evidence of his peaceful character; (2) excluding evidence of threats made against him; and (3) failing to instruct the jury on heat-of-passion manslaughter. Finding no reversible error, we affirm Decatur's conviction and sentence.

**FACTS**

¶2.     Several days prior to Trunnell's death, Decatur delivered one of two missing dogs to the home of his brother-in-law Cord Johnson.  Decatur testified at trial that he found a female pit bull running loose and put the dog inside his vehicle.  Decatur recognized the pit bull because the owner, William Butler, was a first cousin to Decatur's wife Ashley.  After receiving the female pit bull from Decatur, Cord testified that he contacted Butler, who did not believe Decatur had simply found the dog.  Instead, Butler accused Decatur of stealing both his male and female pit bulls.  Cord testified that around 9 p.m. on April 22, 2015, Butler, Trunnell, and Albert English Jr. came to his home.  Cord stated that Butler and English were his cousins and that they were looking for Butler's missing male pit bull.  Cord further stated that Trunnell had come to his home "to add evidence that he did see [Decatur] with the dog."  Cord testified that the three men were upset when they left his home and that he "felt like they were going to do something to [Decatur]."

¶3.     Ashley and her mother Linda Johnson testified that Butler, English, and Trunnell also came to their home that evening.  Although she was unsure of the exact time, Linda testified that it might have been around 10 p.m. when the three men arrived.  Both Ashley and Linda stated that Butler and English arrived in one vehicle and that Trunnell arrived in a second vehicle.  Ashley testified that Butler, who appeared angry and upset, accused Decatur of stealing his dog.  Linda likewise testified that the three men were upset over Butler's missing dog and that they appeared to still be upset after they spoke with her and Ashley.  Once the three men drove away, Linda called Decatur.  Linda testified she told Decatur that Butler,

2

English, and "some other guy" she did not know had come to the house and were upset. Linda stated that she warned Decatur about the three men because she did not want anyone to hurt him.

¶4.     Decatur testified that he was at the gym on April 22, 2015, when Linda called him between 10 p.m. and 10:45 p.m.  As he was speaking to Linda, Decatur received another call from Butler.  Decatur testified that Butler was very hostile and accused him of stealing a male pit bull.  Decatur denied having Butler's missing dog and asked Butler to stop going to his home and making threats against him.  Decatur stated that after he diffused the tension with Butler, he and Butler agreed to meet to further discuss the matter.

¶5.     No dispute exists that Decatur subsequently drove to encounter Butler and English at their grandmother's home.  Nor does any dispute exist that during the encounter, Decatur produced a handgun and fired four or five shots, one of which killed Trunnell.  After leaving the crime scene, Decatur drove home, called police, and surrendered himself to law enforcement.  Following his arrest, Decatur waived his *Miranda*[1] rights and gave a statement to Detective Jermaine Magee of the Jackson Police Department.  Decatur told Detective Magee about the dispute that had arisen between him and Butler regarding Butler's missing dog.  After speaking with Butler on the phone, Decatur stated that he had agreed to drive over to the home of Ashley, Butler, and English's grandmother to meet with Butler in person. Decatur stated that Butler and English were standing outside when he pulled up and exited his vehicle.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶6.    Although he admitted at trial that he lied about what happened next, Decatur claimed during his pretrial interview that Trunnell pulled up beside him as he was speaking to Butler and English.  According to Decatur's first version of his story during his statement to police, Trunnell began speaking in a hostile manner and waving a black handgun at him.  Decatur told Detective Magee that he decided to leave because he felt as though he had been set up by the other three men.  Decatur stated that as he walked back toward his vehicle, he heard Trunnell put his vehicle in park and declare that he was going to "blast" Decatur.  Decatur claimed that Trunnell's actions scared him so he pulled out his own weapon and fired about three to five shots at Trunnell.  Although he did not know where all his bullets went, Decatur stated that he saw one shatter the rear window of Trunnell's vehicle and another hit the vehicle's tailgate.  Decatur told Detective Magee that Trunnell was the only person he had seen in possession of a gun.

¶7.    After interviewing Decatur, Detective Magee reviewed video footage of the shooting.  Detective Magee discovered that the video footage contradicted Decatur's version of events in several important respects.  The police obtained the video footage from William Melton, a former deputy with the Hinds County Sheriff's Department.  Melton lived on the street corner where the shooting had occurred, and his home security cameras had captured the shooting.  While sitting in his home office, Melton received an alert on his computer that notified him of rapid movement outside his home.  Melton's security cameras showed Decatur's white Chevrolet Impala driving quickly along the street.  Decatur ran a stop sign and then parked a few feet behind Trunnell's already parked silver Ford Expedition.  Melton

4

watched on his computer as Decatur exited his Impala and walked toward the front of the vehicle. As Decatur reached the front of his vehicle, he fired a gun four to five times. The video showed that only a few seconds had passed between the time Decatur exited his vehicle and when he fired his gun. Melton testified that he had his office window slightly open and could hear the gunshots as he watched events unfold on his computer. After firing his gun, Decatur approached the passenger side of Trunnell's Expedition and looked into the vehicle. He then turned his back on the scene, walked back to his own vehicle, and drove away.

¶8. Melton called 911 and went outside to check on everyone. Melton testified that he looked for a gun as he approached the crime scene but did not see one either inside Trunnell's vehicle or in the possession of anyone present. As Melton approached the street, he saw three or four men attempting to pull Trunnell from the Expedition and load him into another vehicle to take him to the hospital. Melton testified that there was a lot of blood at the scene and that Trunnell did not appear to be conscious.

¶9. The only weapon investigators recovered in connection with the shooting was Decatur's gun. Upon searching Decatur's Impala, investigators found a Glock 9-millimeter handgun with live rounds in the magazine. Investigators also found ammunition in the vehicle's center console and on the rear floorboard. From the crime scene, investigators collected one bullet and five shell casings from the street near the rear of Trunnell's Expedition. During their search of the Expedition's interior, investigators discovered another bullet lodged in the vehicle's rear speaker. In addition, investigators noted that the Expedition's rear window was shattered and that there was a bullet hole visible in both the

5

vehicle's back door and front window.

¶10.    At trial, Decatur admitted that he had lied during his interview with Detective Magee. Decatur attributed his lies to a desire to protect Butler and English, who were his wife's cousins. Decatur testified at trial that during his phone conversation with Butler on April 22, 2015, he had agreed to meet Butler at Butler's residence. Decatur testified that on his way to Butler's residence, he drove by the home of Ashley, Butler, and English's grandmother. Decatur stated that he observed Butler's red Chevrolet Tahoe and a silver Ford Expedition parked on the street outside the residence. Decatur stated that he parked behind the silver Expedition and exited his own vehicle to speak to Butler. Decatur testified that Butler was seated in the driver's seat of the Tahoe and that English was standing between the Expedition and the Tahoe.

¶11.    Decatur claimed that he was "actually outside [his] vehicle a good little minute" before he fired his gun. The video footage showed, however, that only a few seconds passed between the time Decatur exited his vehicle and the time he first fired his weapon. According to Decatur's trial testimony, English pulled out a gun as he approached. Decatur claimed that English's actions scared him so he pulled out his own gun and fired the weapon four or five times. Decatur testified that English dropped the gun he was holding and that he (Decatur) approached the other men to check on them. Decatur stated that he glanced inside the silver Expedition and realized for the first time that Trunnell was in the driver's seat. Decatur testified that he saw Trunnell move and therefore assumed Trunnell was fine. Despite Decatur's claims that he was afraid for his life and knew there was a gun on the

6

ground near English and Butler, the video footage showed that Decatur turned his back on the other men as he walked back to his vehicle and left the crime scene.

¶12. The jury heard testimony that Trunnell died from a gunshot wound to the back of his head. On cross-examination, Decatur admitted that he was the only one who discharged a weapon the night of the shooting and that it was a bullet from his gun that killed Trunnell. Unlike during his interview with Detective Magee, Decatur admitted at trial that he did not see Trunnell with a gun the night of the shooting and that he did not even know Trunnell was inside the silver Expedition, which was already present when Decatur arrived. Also in contrast to his pretrial statement, Decatur testified that Trunnell made no threats against him the day of the shooting. Although four of his bullets hit either Trunnell's person or vehicle, Decatur claimed that he was not really aiming his gun and had not intended to hurt anyone. Decatur admitted, however, that he was upset Butler, English, and Trunnell had gone to his home and spoken to his wife about the disagreement over Butler's dog. Decatur further admitted that he had previously worked as a prison guard, was presently a member of the Army National Guard, and had fired guns as part of his military training.

¶13. Detective Magee testified that prior to his interview with Decatur, he interviewed several other individuals about the shooting. None of the other interviewees mentioned a dispute over a missing dog. Moreover, although Decatur claimed that Butler, English, and Trunnell had gone to his home about an hour prior to the shooting and had made threats against him, other interviewees reported that Trunnell had been at a grocery store just before the shooting and had then driven straight to the home of Butler and English's grandmother.

7

Detective Magee stated, however, that during his interview with Ashley, she mentioned that threats had been made against Decatur prior to the shooting. Detective Magee testified that in his experience, a person who felt threatened usually called the police to report the situation. He stated, though, that the police had received no information regarding the alleged threats against Decatur until after Decatur shot Trunnell.

¶14. After considering all the evidence and testimony, the jury convicted Decatur of second-degree murder. The circuit court sentenced Decatur to thirty years in MDOC's custody, with ten years to serve, twenty years suspended, and five years of supervised probation. Decatur unsuccessfully moved for a new trial or, alternatively, a judgment notwithstanding the verdict. Aggrieved, he appeals.

## DISCUSSION

### I. Exclusion of Evidence

¶15. Decatur contends that the circuit court erroneously excluded testimony about (1) his character for peacefulness and (2) threats made against him prior to the shooting. We review the admission or exclusion of evidence for abuse of discretion. *Ross v. State*, 308 So. 3d 885, 889 (¶10) (Miss. Ct. App. 2020). "We give great deference to the discretion of the trial judge, and unless we conclude that the decision was arbitrary and clearly erroneous, amounting to an abuse of discretion, the trial judge's decision will stand." *Griffin v. State*, 269 So. 3d 337, 346 (¶24) (Miss. Ct. App. 2018) (quoting *Chaupette v. State*, 136 So. 3d 1041, 1045 (¶7) (Miss. 2014)).

### A. Decatur's Character Evidence

8

¶16. Mississippi Rule of Evidence 404(a)(1) provides that "[e]vidence of a person's character or character trait" is generally inadmissible to show "that on a particular occasion the person acted in accordance with the character or trait." An exception applies to criminal cases, however, and the Rules permit a criminal defendant to offer evidence of his own pertinent trait. M.R.E. 404(a)(2)(A). If the circuit court admits the defendant's character evidence, the State may then offer evidence in rebuttal. *Id.*

¶17. Here, Decatur intended to offer evidence of his propensity for peacefulness through defense witness Jerry Johnson. Prior to trial, the State moved to exclude Johnson's testimony. In response, Decatur's attorney explained that Johnson's character testimony was vital to Decatur's theory of self-defense. Decatur's attorney asserted that questions existed regarding the initial aggressor in the shooting and the participants' propensity for violence or peacefulness. Although the circuit court initially declined to rule on the State's motion, the court later granted the motion and excluded Johnson's testimony. On appeal, Decatur argues the circuit court's exclusion of the evidence constituted reversible error.

¶18. Upon review, we agree that the circuit court erred by excluding Johnson's testimony, which was admissible under Rule 404(a)(2)(A). We further conclude, however, that the exclusion of the character evidence was harmless. "A party must do more than simply show some technical error has occurred before he will be entitled to a reversal on the exclusion or admission of evidence; there must be some showing of prejudice." *Crump v. State*, 237 So. 3d 808, 816 (¶25) (Miss. Ct. App. 2017) (quoting *Pham v. State*, 716 So. 2d 1100, 1102 (¶12) (Miss. 1998)).

9

¶19. As the record reflects, it was not necessary that the jurors hear evidence of Decatur's character or propensity for peacefulness for them to understand his theory of the case. Decatur testified on his own behalf and presented his self-defense claim to the jury. Decatur recounted his version of the events that led to the shooting, including his assertions that Butler had threatened him, that English had produced a weapon as he approached, and that he only fired his gun because he was scared by the other men's actions. Because the exclusion of the character evidence failed to prejudice Decatur, we conclude that the circuit court's error was harmless.

### B.    Evidence of Threats

¶20. Decatur planned to present testimony from Cord, Ashley, and Linda that Butler, English, and Trunnell showed up at their homes prior to the shooting and that Butler threatened Decatur. The circuit court concluded the proposed testimony was hearsay and was irrelevant. As a result, the circuit court excluded the testimony. On appeal, Decatur contends that the threats against him were admissible and relevant to demonstrate his state of mind when he fired his gun. He therefore asserts that the circuit court's exclusion of the evidence amounted to an abuse of discretion.

¶21. Evidence is admissible if it is relevant, but "evidence that is . . . far removed from an issue at trial is not relevant under [Mississippi] Rule [of Evidence] 401 and may be excluded by the trial court in the exercise of discretion." *Brisco v. State*, 295 So. 3d 498, 508 (¶19) (Miss. Ct. App. 2019). To admit evidence of threats, the party offering the evidence must demonstrate "a causal relationship between the threat and the purpose for which it is

10

offered." *Id.* at 509 (¶21). As this Court recently explained:

> [W]hen [there is a] question of who was the aggressor in either a homicide or assault[-]with[-]a[-]deadly[-]weapon prosecution, proof of the victim's bad reputation for violence or threats that he has made against the defendant is competent.
>
> Evidence of prior violent acts of the victim, *when known to the defendant*, are also relevant and admissible under [Mississippi] Rule [of Evidence] 404(b) to show the defendant's state of mind at the time of the incident and the reasonableness of his use of force.

*Bell v. State*, 303 So. 3d 22, 27 (¶¶16-17) (Miss. Ct. App. 2020) (citations and internal quotation marks omitted).

¶22. Outside the jury's presence, the circuit court questioned Decatur's attorney at length regarding the proposed witness testimony about the alleged threats. Decatur's attorney explained that about one to one-and-a-half hours prior to the shooting, Butler, English, and Trunnell drove first to Cord's home and then to Ashley and Linda's home looking for Decatur. While at the residences, Butler allegedly made threats against Decatur. Decatur's attorney admitted that Trunnell drove separately from the other two men and did not actually make the statements at issue. Even so, Decatur's attorney attempted to argue that Trunnell acted "collectively" in making the threats because he "stood there and acquiesced" while Butler made the remarks.

¶23. Decatur's attorney explained that Cord planned to testify that he relayed Butler's threats to his mother (Linda) and his sister (Ashley). Cord apparently never directly relayed the threats to Decatur, however. Linda and Ashley planned to testify that Butler also made threats against Decatur in their presence, and Linda planned to testify that she called Decatur

11

to tell him about the threats.

¶24.   In arguing the admissibility of the threats, the defense offered no evidence that Decatur had firsthand knowledge of them.  As Decatur himself testified, he was not present at either residence when the threats were allegedly made.  Moreover, all the evidence, including Decatur's own testimony, indicated it was Butler—and not Trunnell—who made the threatening remarks.  The circuit court's ruling did not preclude Cord, Ashley, and Linda from testifying that Butler and the other men appeared angry and upset over Butler's missing dog.  The jury also heard Linda's testimony that she was worried about Decatur's safety after the three men's visit and that she called Decatur to warn him.

¶25.   The circuit court's ruling also did not prevent Decatur from testifying about his own personal knowledge of any threats against him or his state of mind at the time of the shooting.  But like the other defense witnesses, when Decatur testified regarding the threats, he stated that Butler was the one who called him prior to the shooting and acted in a hostile manner toward him.  He further testified that it was Butler, not the victim Trunnell, he asked to stop making threats against him.

¶26.   Although Decatur's attorney asserted that Trunnell acted "collectively" in and "acquiesced" to the making of the threats against Decatur, the excluded witness testimony failed to support these assertions.  The proposed testimony neither tended to prove that Trunnell had threatened Decatur or that Decatur had any knowledge of prior acts of violence committed by Trunnell.  *See Bell*, 303 So. 3d at 27 (¶¶16-17).  We therefore find that Decatur failed to demonstrate "a causal relationship between the threat and the purpose for which it

[wa]s offered." *Brisco*, 295 So. 3d at 509 (¶21). Because we find no abuse of discretion in the circuit court's exclusion of the evidence as irrelevant, we conclude that this issue lacks merit.

## II. Refusal of Manslaughter Instruction

¶27. In his final assignment of error, Decatur argues the circuit court erred by refusing his proposed jury instruction on the lesser-included offense of heat-of-passion manslaughter.[2] The proposed instruction stated:

> [T]he court instructs the jury that if you find beyond a reasonable doubt from the credible evidence that the defendant did kill the deceased but the same was not done with premeditation or malice aforethought, but was done with certain heat of passion, then you may find the defendant guilty of manslaughter[,] and the form of the verdict may be, ["]We, the jury, find the defendant guilty of manslaughter.["]

¶28. We review the grant or refusal of jury instructions for abuse of discretion. *McNeer v. State*, 307 So. 3d 508, 513 (¶12) (Miss. Ct. App. 2020). "It is well established that 'a defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.'" *Bell*, 303 So. 3d at 30 (¶26) (quoting *Ronk v. State*, 172 So. 3d 1112, 1125 (¶20) (Miss. 2015)). With regard to lesser-included-offense instructions, our

---

[2] Decatur also asserts that the evidence supported a culpable-negligence-manslaughter jury instruction. No such proposed jury instruction appears in the record, however, and we cannot find anything in the record that would allow this Court to "intelligently act on any question about [such] an instruction." *Lindsey v. State*, 990 So. 2d 270, 272 (¶7) (Miss. Ct. App. 2008) (quoting *Harris v. State*, 386 So. 2d 393, 396 (Miss. 1980)). We therefore find that this issue is not properly before us. *Id.*

13

caselaw acknowledges:

> [They] should be granted unless the trial judge[—]and ultimately this Court[—]can say, taking the evidence in the light most favorable to the accused and considering all reasonable favorable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of the lesser[-]included offen[s]e (and conversely not guilty of at least one essential element of the principal charge).

*Lacey v. State*, 310 So. 3d 1206, 1213 (¶15) (Miss. Ct. App. 2020) (quoting *Adams v. State*, 772 So. 2d 1010, 1016 (¶20) (Miss. 2000)).

¶29. Here, the circuit court instructed the jury on first-degree murder, second-degree murder, and self-defense. The circuit court found, however, that the evidence failed to support Decatur's proposed instruction on the lesser-included offense of heat-of-passion manslaughter. As a result, the circuit court refused the proposed instruction.

¶30. In previously discussing heat-of-passion manslaughter, this Court explained:

> A homicide will be downgraded from murder to manslaughter if it was committed without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense. A heat of passion is a state of violent and uncontrollable rage engendered by a blow or certain other provocation. The passion or anger must be suddenly aroused at the time of the killing by some immediate and reasonable provocation. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment[,] or terror. Additionally, words alone and disagreements among people are not enough to invoke the passion required for this defense. Mere words, no matter how provocative, are insufficient to reduce an intentional and unjustifiable homicide from murder to manslaughter.

*Baker v. State*, 304 So. 3d 707, 712 (¶17) (Miss. Ct. App. 2020) (citations and internal quotation marks omitted).

¶31. The evidence presented at Decatur's trial reflected that the dispute over Butler's

missing dog escalated over the course of several days rather than suddenly. Indeed, Decatur even states as much in his appellate brief. Although Decatur testified that Butler had made threats against him and was initially hostile when they spoke on the phone, Decatur stated that he diffused the situation before ending the conversation. As discussed, our caselaw holds that words and disagreements, without more, constitute insufficient provocation for heat-of-passion manslaughter. *Baker*, 304 So. 3d at 712 (¶17). And although Decatur admitted that he was upset that Butler and the other men had gone to his home to find him, at no point during either his pretrial statement or his trial testimony did Decatur indicate that Butler took additional action at the crime scene that would have provoked Decatur to draw his weapon and fire multiple shots.

¶32. Decatur initially claimed that it was Trunnell who provoked him into defending himself. In his pretrial statement, Decatur said that Trunnell arrived at the crime scene and began waving a gun and making threatening statements. Decatur later recanted these claims at trial, however, and admitted that he never saw or spoke to Trunnell the day of the shooting and did not even know Trunnell was present until after the shooting occurred.

¶33. At trial, Decatur testified that English, not Trunnell, had produced a gun as he parked and approached. Decatur claimed that English's actions had scared him so much that he instinctively fired his gun four or five times in response. Despite Decatur's assertions, however, no evidence presented at trial supported his claims that anyone else at the crime scene brandished a weapon at him.

¶34. The jury watched the video footage of the shooting, which showed Decatur drive

15

quickly down the street, run a stop sign, and then exit his vehicle. A few seconds later, Decatur fired multiple shots into Trunnell's vehicle. After briefly walking toward the other men, Decatur turned his back on them and returned to his own vehicle. Decatur admitted at trial that he was the only one who fired a weapon, and Detective Magee testified that no other weapon was recovered in connection with the crime. In addition, the jury heard testimony from Melton, a former deputy with the Hinds County Sheriff's Department, who not only watched the shooting from his home computer as it occurred but then walked outside to the crime scene after the shooting. Melton stated that he specifically looked for a weapon at the scene but did not observe one either inside Trunnell's vehicle or in anyone else's possession.

¶35.    Even viewing the evidence in the light most favorable to Decatur, we find no abuse of discretion in the circuit court's refusal of Decatur's proposed instruction on heat-of-passion manslaughter. The evidence failed to support Decatur's assertions that he acted due to uncontrollable passion or anger that was "suddenly aroused at the time of the killing by some immediate and reasonable provocation." *Baker*, 304 So. 3d at 712 (¶17) (quoting *Jones v. State*, 39 So. 3d 860, 866 (¶36) (Miss. 2010)). Because Decatur's refused jury instruction lacked a foundation in the trial evidence, we find this assignment of error lacks merit.

## CONCLUSION

¶36.    Because we find no reversible error, we affirm Decatur's conviction and sentence.

¶37.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR. McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**

16